



FILED

Jul 06 2026, 9:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Zachary Clay Parksey,

*Appellant-Petitioner*

v.

State of Indiana,

*Appellee-Respondent*

---

July 6, 2026

Court of Appeals Case No.
25A-PC-2268

Appeal from the Vanderburgh Circuit Court

The Honorable Ryan D. Hatfield, Judge

The Honorable Celia M. Pauli, Magistrate

Trial Court Cause No.
82C01-2404-PC-2557

---

**Opinion by Judge Altice**

Judges Brown and DeBoer concur.

**Altice, Judge.**

## Case Summary

[1] Zachary C. Parksey pled guilty to Level 2 felony voluntary manslaughter in exchange for dismissal of a murder charge. Thereafter, he sought post-conviction relief (PCR), arguing that he was unaware, when he pled guilty, that he would be subject to mandatory lifetime parole and that had he known, he would not have accepted the plea agreement. In his pro se PCR petition, Parksey asserted both that his plea was not entered voluntarily and knowingly and that his trial counsel was ineffective.

[2] The PCR court denied relief on the basis that neither the trial court nor trial counsel was required to advise Parksey of the lifetime parole requirement before he entered his plea. We conclude that the trial court erroneously relied on cases from the 1980s that addressed parole in its ordinary sense, not the special lifetime parole term applicable to those convicted of murder or voluntary manslaughter as mandated by Ind. Code § 35-50-6-1(e)(2) and (3). As a matter of first impression, we hold that mandatory lifetime parole is a direct, as opposed to collateral, consequence of a plea to voluntary manslaughter and that a defendant is entitled to be advised regarding this consequence before pleading guilty. Here, conflicting evidence was presented as to whether counsel advised Parksey regarding the lifetime parole requirement, and the PCR court did not

resolve the factual dispute. Nor did the PCR court make determinations regarding prejudice or the materiality of any failure to so advise. Accordingly, we reverse and remand for the PCR court to make the necessary evidentiary determinations.

[3] We reverse and remand.

## Facts & Procedural History

[4] On the afternoon of October 8, 2022, Parksey stabbed his longtime friend, Colin McHargue, once in the neck in the men's restroom of Mo's House, a local bar in Evansville. Prior to the fatal stabbing, Parksey and McHargue entered the bar together and opened a joint tab. They had several drinks together and by all accounts seemed to be good friends.

[5] Martin Warren was sitting next to them at the bar. At some point, Parksey turned to Warren and said, "I'm trashed." *Exhibits Vol. 3* at 116. Another patron, Timothy Morris, also noted that Parksey seemed intoxicated. On his way to the restroom, Parksey stopped and talked with a couple, Robert Gwaltney and Susan Gerth, who were sitting at a table. McHargue, still sitting at the bar, saw this and said to Morris, "I better go get him and take him home … he's had too much to drink." *Id*. at 117. McHargue followed Parksey into the restroom, apologizing to Gwaltney and Gerth along the way.

[6] Warren was in the mens restroom when Parksey and McHargue entered, and he noticed that they were shoving each other and arguing. Warren left the restroom and then minutes later, Parksey came out covered in blood but with

no apparent injuries. Individuals at the scene reported Parksey making several statements upon exiting the restroom. These included: "Call an ambulance"; "I'm going to prison"; "Do I need to call my lawyer?"; and "He attacked me at the pisser." *Id.* at 116, 116, 108.

[7] Parksey proceeded to the patio area next to the restroom and was overheard saying, "Oh my God, I'm going to prison for the rest of my life." *Id.* at 127. He then tried to climb the privacy fence after the gate would not open. Morris, who saw the blood on Parksey, yelled at him to figure out what was going on. Parksey responded, "I just messed up[.]" *Id.* at 117. Morris then walked back into the bar with Parksey. Other patrons on the patio heard Parksey say that "his friend attacked him." *Id.* at 127.

[8] Bartender Alexandria Burris, who was in the adjacent women's restroom and heard the commotion, spoke with Parksey when he came in from the patio area. She asked Parksey what had happened, and Parksey explained that McHargue grabbed his shoulders and said something threatening to him while Parksey was using the restroom, causing Parksey to turn around and stab him. Parksey tried to hand Burris the knife, but she refused to take it, so he placed it back in his pocket. Burris eventually told Parksey that he needed to leave and pointed him in the direction of the exit. Others provided aid to McHargue in the restroom, but he succumbed to the single stab wound.

[9] Parksey left the establishment and called his girlfriend, Kaylee Sutherlin, telling her, "I'm going to jail[.]" *Id.* at 118. As police arrived, Parksey was walking east

on Jefferson Avenue, and he tossed the knife into thick overgrowth under a bush.[1] He was taken into custody without incident. Four days later, during a recorded video visit with Sutherlin at the jail, Parksey stated, "I just want to figure out what all happened." *Id.* at 143.

[10] On October 11, 2022, the State charged Parksey with murder. Shortly thereafter, Barry M. Blackard (Attorney Blackard) entered his appearance on behalf of Parksey and tendered a notice of self-defense, along with a motion for an early trial. The trial court scheduled the matter for trial on December 19, 2022, but trial was later rescheduled for April 10, 2023, after Parksey withdrew his early trial request.

[11] On April 6, 2023, Parksey and the State entered into a negotiated plea agreement and a change of plea hearing occurred that same day. Parksey pled guilty to a new charge of voluntary manslaughter in exchange for dismissal of the murder charge. The plea agreement left sentencing open to the court's discretion and provided for waiver of Parksey's right to appeal his sentence.

[12] Parksey was not advised at the plea hearing, nor in the plea agreement or written advisement of rights, that his conviction would carry with it mandatory lifetime parole. Regarding his penalty for voluntary manslaughter, he was

---

[1] The knife was recovered by police the next morning in this same location just east of the bar.

advised by the trial court only that he faced between 10 and 30 years in custody and a possible fine up to $10,000.

[13] At the sentencing hearing on May 25, 2023, the trial court sentenced Parksey to twenty years in the Indiana Department of Correction (DOC). As mitigating, the court observed that Parksey was at a low risk to reoffend, he pled guilty and accepted responsibility, he had no prior criminal history, he had a master's degree in chemistry, and he expressed remorse. The court found, however, that the mitigating circumstances were outweighed by the nature and circumstances of the crime[2] and the harm to the victim's family, friends, and community. The court also noted at sentencing that Parksey was required by law to register as a violent offender, but it made no mention of the lifetime parole requirement.

[14] Less than a year later, Parksey, pro se, filed a verified PCR petition, which he amended on July 12, 2024. In his amended petition, Parksey claimed that his plea was involuntary or unintelligent and that he was denied effective assistance of trial counsel. The primary allegation supporting both grounds was that he was not advised by the trial court or Attorney Blackard regarding mandatory lifetime parole, which he claimed was a direct consequence of his conviction for voluntary manslaughter. Parksey alleged that had he known about this direct lifetime consequence, he would not have pled guilty and instead would have elected to go to trial on the murder charge. Parksey moved to set the matter for

---

[2] The court recognized that both parties were "very intoxicated" and noted that "it's hard to understand what happened" to cause the stabbing. *Exhibits Vol. 3* at 52.

an evidentiary hearing and requested the issuance of witness subpoenas to, among others, Attorney Blackard and Sutherlin.[3]

[15] The PCR court initially denied Parksey's request for an evidentiary hearing and, in July 2024, ordered the parties to proceed by affidavit. The court also agreed to take judicial notice of the trial record. On September 17, 2024, Parksey reasserted his request for an evidentiary hearing and the issuance of subpoenas and filed his affidavit in support of the amended petition. Parksey averred in part:

> 5. In the absence of proper advice, I errantly agreed to plead guilty to the amended charge of voluntary manslaughter, a level two (2) felony.
>
> ****
>
> 9. The day of the Change of Plea Hearing was the first time I had seen the Written Plea Agreement, which was discussed minimally beforehand with [Attorney] Blackard.
>
> 10. At no point did [Attorney] Blackard ever mention "lifetime parole," nor was there any reference to anything above and beyond the terms of the articles specified in the Written Plea Agreement[.]

---

[3] In his affidavit in support of issuance of a subpoena to his girlfriend, Parksey averred in part that "Sutherlin's testimony will be crucial in corroborating specific instances of ineffective assistance of counsel through her first-hand knowledge and interactions with [Attorney] Blackard." *Appendix Vol. 2* at 72-73.

****

12. At no point during my Change of Plea Hearing was any reference made to "lifetime parole," the "violent offender registry," or my being classified as a "violent offender" subject to "lifetime parole" by operation of law.

****

14. That parole is still considered incarceration and this plea would extend my term of imprisonment for literal decades past the ten (10) to thirty (30) years requisite for a level (2) felony.

15. Failure of the trial court to properly advise a Defendant of a mandatory minimum sentence renders a guilty plea invalid under I.C. § 35-35-1-2(a)(3), as involuntary.

16. Failure of an attorney to competently advise a client of a mandatory, lifetime term of parole constitutes deficient performance . . . and constitutes a major ground for reversal of a conviction.

****

19. That I requested, on more than one occasion, that [Attorney] Blackard file the requisite motion to withdraw my guilty plea in the weeks leading up to sentencing, and that he outright refused to do as I instructed.

20. That I did not learn of the existence of "lifetime parole," as outlined by I.C. § 35-50-6-1(e), until after my Sentencing Hearing; being informed of that requirement by the [DOC].

24. That under no circumstances would I, or any other sane person, ever willingly agree to an alleged "plea bargain" with a lifetime of punishment of any form attached to it, prejudice may be implied by the qualifier of "lifetime."

25. That I should never have even entertained the idea of pleading guilty to any charge, lesser-included or otherwise, due to the overwhelming evidence of justification by reason of self-defense (I.C. § 35-41-3-2) present in the discovery file associated with the underlying cause.

*Appendix Vol. 2* at 117-20.

[16] Following several additional filings by Parksey, including a motion to compel and a motion for sanctions against Attorney Blackard for failing to respond to written interrogatories, the PCR court, on November 26, 2024, scheduled an evidentiary hearing for February 18, 2025. The court issued a subpoena only to Attorney Blackard to appear at the hearing.

[17] The PCR court held a brief evidentiary hearing on February 18. In addition to his earlier affidavit, Parksey presented several exhibits that were admitted into evidence by the court. Attorney Blackard and Parksey also both testified at the hearing. Attorney Blackard testified that initially he and Parksey believed that there might be evidence that the victim had been under the influence of methamphetamine, but the toxicology results did not show methamphetamine in his system. While the victim did have alcohol and THC in his system, Attorney Blackard did not feel that these substances would be "consistent with

… a violent unprovoked attack in a way that Methamphetamine might have." *Transcript Vol. 2* at 11-12. Attorney Blackard pursued a plea agreement, which he believed he was able to obtain because "this was not your typical murder case" – as Parksey and McHargue had a "very close personal friendship" and "a high level of intoxication was involved." *Id*. at 14. That is, he felt the facts were more consistent with voluntary manslaughter than murder.

[18]    Regarding lifetime parole, Attorney Blackard testified:

> I can't answer as to why it's not included in the plea agreement or why it's not included in the advisement, but that is a requirement of voluntary manslaughter as it is with many other cases and you and I did have that discussion. I do recall you and I having that discussion as that being a requirement.

*Id*. at 17. On cross-examination, the State clarified:

> Q.    And you had testified, so I want to make sure this is correct, that **prior to the sentencing** you had advised or had a conversation with the Petitioner regarding the quote, un-quote, consequences of a voluntary manslaughter plea including lifetime parole and being on the violent offender registry. Is that correct?
>
> A.    Yes.

*Id*. at 23 (emphasis added). Additionally, Attorney Blackard testified that Parksey did not express a desire to withdraw his plea until right after he was sentenced.

[19] Parksey then testified and refuted any notion that he had been advised of the lifetime parole requirement prior to pleading guilty. He testified that such a requirement "completely changes the nature of the plea" because "the reality is that it's not ten to thirty years, its ten to thirty to life with all kinds of extra stipulations and other strange penalties usually only for sexually violent predators." *Id.* at 30. Noting that Attorney Blackard had "willfully ignore[d]" a court order to respond to discovery, Parksey argued, "if it comes down to a circumstance between his word against mine then surely I mean I should get some (inaudible) there considering that the lifetime parole is nowhere in the record." *Id.*

[20] At the conclusion of the hearing, Parksey made the following request, which was denied by the PCR court:

> I mean well in order to rebut some of [Attorney] Blackard's troubling testimony I mean I made a further request for a subpoena for [Sutherlin] as well as a subpoena duces tecum request so maybe I can get some electronic communication between [Attorney] Blackard and [the deputy prosecutor], that will at least prove my case in point that, show Mr. Blackard's testimony is not truthful.

*Id.* at 35.

[21] The PCR court took the matter under advisement, and the parties later filed proposed findings and conclusions. Thereafter, on August 29, 2025, the court issued its order denying PCR to Parksey.

[22] Parksey now appeals. Additional information will be provided below as needed.

## Standard of Review

Post-conviction actions are civil proceedings, meaning the petitioner must prove his claims by a preponderance of the evidence. *Bobadilla v. State*, 117 N.E.3d 1272, 1279 (Ind. 2019); Ind. Post-Conviction Rule 1(5).

> If he fails to meet this burden and receives a denial of post-conviction relief, then he proceeds from a negative judgment and on appeal must prove that the evidence, as a whole, unmistakably and unerringly points to a conclusion contrary to the post-conviction court's decision. When reviewing the court's order denying relief, we will not defer to the post-conviction court's legal conclusions, and the findings and judgment will be reversed only upon a showing of clear error – that which leaves us with a definite and firm conviction that a mistake has been made.

*Bobadilla*, 117 N.E.3d at 1279 (internal quotations and citations omitted).

## Discussion & Decision

This case presents an issue that has not been addressed in any precedential opinion in our state appellate courts: Does a defendant pleading guilty to voluntary manslaughter (or murder) have a right to be advised that such a conviction carries with it mandatory lifetime parole?

The PCR court answered this question in the negative and thus denied relief to Parksey. It explained:

> There is no requirement that a person entering a plea of guilty be advised as to the possible future effects the parole statutes will have upon his incarceration. *Jones v. State*, 491 N.E.2d 542, 543

(Ind. 1986). Knowledge of parole requirements is not essential to the voluntary and knowing character of a guilty plea. *Id*. The parole impact of a plea is neither a constitutional right nor an advisement required by statute. *Fulmer v. State*, 519 N.E.2d 1236, 1238 (Ind. 1988).

*Appendix Vol. 3* at 74-75. The State asserts this same stance on appeal and argues that parole is a collateral consequence of a conviction, not a direct consequence.

[26] We agree with Parksey that *Jones* and *Fulmer* do not control the outcome in this case. Both of those cases, as well as *Greer v. State*, 428 N.E.2d 787 (Ind. 1981), upon which *Jones* relied, dealt with parole in the ordinary sense, not parole extending beyond the fixed sentence term. Indeed, our Supreme Court in *Greer* observed that I.C. § 35-50-6-1 (at that time) "[did] not provide for mandatory parole to be served after the term established in the sentence." *Greer*, 428 N.E.2d at 790. The Court continued: "The parole requirements in the statute have general application to persons imprisoned for felonies, and do not constitute a special penal consequence for those found guilty of []voluntary manslaughter." *Id*. at 790-91. Thus, the Court held that knowledge of the general parole requirements "was not essential to the voluntary and knowing character of appellant's plea." *Id*. at 791.

[27] The holding in *Greer* was endorsed in a federal habeas corpus case, *Greer v. Duckworth*, 555 F.Supp. 725 (N.D. Ind. 1983).[4] The district court observed that

---

[4] The Indiana Supreme court cited this district court case to support its holding in *Jones*, 491 N.E.2d at 543.

federal law supported the actions of the state court as there is no requirement for a defendant to be advised as to "the indirect consequences of his guilty plea such as eligibility for normal parole release." *Id*. at 728. And the district court emphasized that the Indiana parole statute did not "serve to increase the length of a sentence" because it did not "mandate a parole term beyond the fixed term of incarceration[.]" *Id*. at 729.

[28] I.C. § 35-50-6-1, Indiana's parole statute, has been amended more than ten times since these cases from the 1980s. It now provides under certain limited circumstances for parole to extend well beyond a defendant's fixed term of incarceration. As relevant here, pursuant to an amendment in 2007,[5] a person convicted of voluntary manslaughter or murder is subject to mandatory lifetime parole. I.C. § 35-50-6-1(e) (When a person described in this subsection completes the person's fixed term of imprisonment, less credit time earned with respect to that term, the person shall be placed on parole for the remainder of the person's life.").

[29] Guilty pleas must be entered into knowingly, intelligently, and voluntarily with sufficient awareness of the relevant circumstances and likely consequences. *See Brady v. U.S.*, 397 U.S. 742, 748 (1970). Thus, it is well understood that a defendant must be "fully aware of the direct consequences" of his plea. *Id*. at 755; *see also Virsnieks v. Smith*, 521 F.3d 707, 715 (7th Cir. 2008) ("[A]lthough a

---

[5] *See* P.L.216-2007, SEC.51.

defendant must be informed of the direct consequences flowing from a plea, he need not be informed of collateral consequences."), *cert. denied*.

> The distinction between a direct and collateral consequence of a plea "'turns on whether the result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment.'" *George v. Black*, 732 F.2d 108, 110 (8th Cir. 1984) (quoting *Cuthrell v. Director Patuxent Institution*, 475 F.2d 1364, 1366 (4th Cir.), *cert. denied*, 414 U.S. 1005 (1973)). Under this standard, **direct consequences include a mandatory special parole term**, *United States v. Harris*, 534 F.2d 141 (9th Cir. 1976); ineligibility for parole, *Munich v. United States*, 337 F.2d 356, 361 (9th Cir. 1964); and the maximum punishment provided by law, *U.S. ex rel. Pebworth v. Conte*, 489 F.2d 266, 267 (9th Cir. 1974).

*Stoltz v. State*, 657 N.E.2d 188, 191 (Ind. Ct. App. 1995) (cleaned up and emphasis added) (quoting *Torrey v. Estelle*, 842 F.2d 234, 236 (9th Cir. 1988)).

Further, Ind. Code § 35-35-1-2 provides that before accepting a plea, the trial court must determine that, among other things, the defendant "has been informed of the maximum possible sentence and minimum sentence for the crime charged[.]" I.C. § 35-35-1-2(a)(3). The federal corollary to this statute is Rule 11 of the Federal Rules of Civil Procedure, which recognized, along with federal case law, that special parole was something a defendant must be informed about in relation to the maximum and minimum possible penalty. *See, e.g., U.S. v. Bridges*, 760 F.2d 151, 154 (7th Cir. 1985) (observing that "it is widely accepted" that a defendant should be advised of special parole terms – as opposed to ordinary parole – that are statutorily mandated, follow the primary

sentence and ordinary parole, and subject the offender to reincarceration for the entirety of the special parole term); *Moore v. U.S.*, 592 F.2d 753, 755 (4th Cir. 1979) ("Unlike ordinary parole, which does not involve supervision beyond the original prison term set by the court and the violation of which cannot lead to confinement beyond that sentence, special parole increases the possible period of confinement."); Fed. R. Crim. P. 11(c)(1) advisory committee note to 1982 amendment.

[31] Our Supreme Court, in a different context, addressed the nature of parole in *Bleeke v. Lemmon*:

> [T]he DOC and the Parole Board placing an offender on parole is not an action of judicial discretion. "A parole is not a suspension of a sentence." *Jenkins v. Madigan*, 211 F.2d 904, 906 (7th Cir. 1954). Rather, "[i]t is a substitution during the continuance of the parole, of a lower grade of punishment, by confinement in the legal custody and under the control of the warden within the specified prison bounds outside the prison, for the confinement within the prison adjudged by the court." *Id*. So "[w]hile a parole is an amelioration of punishment, it is, in legal effect, still imprisonment." *Overlade v. Wells*, 234 Ind. 436, 446, 127 N.E.2d 686, 691 (1955) (internal citation omitted). "While on parole the prisoner remains in the legal custody of the parole agent and warden of the prison from which he is paroled until the expiration of the maximum term specified in his sentence or until discharged as provided by law." *Id*. at 446, 127 N.E.2d at 690.

6 N.E.3d 907, 937-38 (Ind. 2014).

[32] I.C. § 35-50-6-1(c) provides in part that "[a] person whose parole is revoked shall be imprisoned for all or part of the remainder of the person's fixed term."

The *Bleeke* Court observed that this provision "does not permit the imposition of an additional sentence to the fixed term." *Bleeke*, 6 N.E.3d 938. Thus, the Court rejected the parolee's claim that the potential revocation of his parole for failure to comply with the Sex Offender Management and Monitoring Program (SOMM) – which required admitting to earlier crimes during a treatment session – would extend his incarceration and thereby violate his Fifth Amendment privilege against compulsory self-incrimination. The Court held that this requirement of SOMM "f[e]ll under the Parole Board's power to offer a constitutionally permissible choice to a lawfully convicted offender: comply with your parole requirements, or serve out the full sentence received as a result of your lawful conviction." *Id*. at 939.

[33]    In so holding, the Court recognized that there are provisions in the parole statute that "create the possibility of a lengthier period of parole for sex offenders, when compared to the offender's fixed term of incarceration." *Id*.

> So it is theoretically possible, under Indiana's parole statutes, for a sex offender to be released from incarceration after serving a portion (or all) of his or her fixed term of imprisonment, and then receive a statutorily mandated assignment to parole for a period which exceeds the time remaining on that fixed term. The statutes do not provide a consequence for if such a parolee violates his or her parole after the expiration of the fixed term. So if, say, such a parolee refused to take a polygraph related to his sexual history because he or she believed it would provide self-incriminating responses without the promise of immunity, could the Parole Board send the parolee to jail? Would the threat of such a period of incarceration – imposed above and beyond the

now-expired original sentence – constitute an attempt at
unconstitutional compulsion?

*Id.* The Court did not answer the question posed, however, as that scenario was
not before it. *See id.* (observing that Bleeke's parole "appears matched to his
fixed term of incarceration, and there seems to be no risk that he will be subject
to its conditions beyond his original release date").

[34] In the years since *Bleeke*, the legislature has made clear that a parolee subject to
lifetime parole may be imprisoned for knowingly or intentionally violating a
condition of parole even after the expiration of the fixed term of imprisonment.
*See* Ind. Code § 35-44.1-3-9(1) (defining the criminal offense of violation of a
lifetime parole condition, a Level 6 felony, or a Level 5 felony with a prior
violation under this section).

[35] In *Rucker v. Warden*, No. 3:19-CV-201 DRL, 2023 WL 2599519 (N.D. Ind.
Mar. 21, 2023), the federal district court addressed essentially the same issue
presented in this case and determined that mandatory lifetime parole was a
direct consequence of the habeas petitioner's guilty plea for which he was
entitled to an advisement before pleading guilty. The court observed that
lifetime parole "extends parole beyond the expiration of the sentence through
the full duration of the [offender's] life." *Id.* at *6. Citing *Bleeke*, the district
court further observed that lifetime parole could subject an offender to
reincarceration beyond an expired original sentence and that "the statutory
scheme subjects sexually violent predators (along with those convicted of

murder and voluntary manslaughter) to onerous parole conditions and to the supervision of the parole board for life." *Id.* at *7.

[36] In determining that the petitioner had presented a valid basis for habeas relief, the district court explained:

> Before accepting a guilty plea, a trial court has the duty to ensure that a criminal defendant understands "the permissible range of sentences," including mandatory minimum sentences. *Dansberry v. Pfister*, 801 F.3d 863, 864 (7th Cir. 2015) (quoting *Boykin v. Alabama*, 395 U.S. 238, 244 n.7 (1969)). In the context of special parole, "it is widely accepted that a defendant should be told of [the] distinguishing characteristics [of special parole], as well as of the mandatory minimum and possible maximum parole terms." *United States v. Bridges*, 760 F.2d 151, 154 (7th Cir. 1985); … Mr. Rucker effectively alleges that he was not advised of the mandatory term, and the waiver of rights he signed compounded this problem by suggesting that he could be subject either to no term of parole or lifetime parole, not that Indiana law required a mandatory life term.
>
> In short, Mr. Rucker's sentence included a lifetime parole term. He says his trial counsel failed to advise him that the parole term would be automatically imposed rather than subject to a meaningful determination by the trial court. His parole term was a direct consequence, so, if substantiated, trial counsel's failure to advise him that it would be automatically imposed constitutes deficient performance. No other procedure corrected this advice – neither the plea colloquy nor the state form drafted by the prosecutor, and left uncorrected by defense counsel.

*Id.* at *8-9.

[37] With the above in mind, we conclude that mandatory lifetime parole was a direct consequence of Parksey's plea to voluntary manslaughter, as it subjected him to parole extending beyond the term of his fixed sentence and effectively increased the length of his sentence. *Cf. Bleek*, 6 N.E.3d at 38 (observing that parole is, in legal effect, still imprisonment). Thus, the PCR court erred as a matter of law in rejecting relief based solely on the conclusion that Parksey had no right to be advised by counsel or the court of the mandatory lifetime parole term before pleading guilty to voluntary manslaughter.

[38] That said, the evidence presented below reflects a factual dispute as to whether Parksey was aware of the mandatory lifetime parole term before pleading guilty. Attorney Blackard testified that he informed Parksey of the lifetime parole requirement and later clarified during his testimony that the advisement came sometime before sentencing. In other words, Attorney Blackard did not clearly testify that the advisement came before Parksey pled guilty. Parksey, on the other hand, consistently claimed throughout his PCR filing and testimony that he did not learn of the lifetime parole term until after he was sentenced. The PCR court noted this factual dispute but did not resolve it.

[39] Further, the PCR court did not reach the issue of whether Parksey established a reasonable probability that he would have rejected the plea agreement and insisted on going to trial if he had been aware of the lifetime parole requirement. *See Bobadilla*, 117 N.E.3d at 1284 (observing that to establish the prejudice component of an ineffective assistance of counsel claim based on deficient guilty plea advisements, the petitioner must do more than simply say

they would have gone to trial, he must establish rational reasons – special circumstances – supporting why he would have made such a decision); *White v. State*, 497 N.E.2d 893, 905 (Ind. 1986) (holding that, except for *Boykin* rights (the right to trial by jury, the right of confrontation, and the right against self-incrimination), a PCR petitioner claiming that his plea was involuntary and unintelligent must go beyond showing a mere failure in the trial court's advisements and must also show resulting prejudice). Parksey's position has been consistent: He would have rejected the plea had he been properly advised. And as to special circumstances, he pointed the PCR court to the specific facts of the case as revealed in the probable cause affidavit and the various police reports that were admitted into evidence, which he argued contained exculpatory self-defense evidence. He also directed the PCR court to Attorney Blackard's testimony that the facts aligned more closely with voluntary manslaughter than murder and to his own statement at the sentencing hearing that he wanted to resolve the case "in a way that doesn't require me to gamble with the rest of my life." *Exhibits Vol. 3* at 47.

[40] In sum, the PCR court's ruling suffered from a fundamental legal error by application of a categorical rule that there is no duty to advise of mandatory lifetime parole. We hold that mandatory lifetime parole was a direct consequence of Parksey's guilty plea of which he should have been advised. As the PCR court did not pass on factual questions regarding whether Parksey received such an advisement from Attorney Blackard or whether the alleged lack of advisement resulted in prejudice to Parksey, we remand for the PCR

court to make such factual determinations upon full consideration of the record, which may include the taking of additional evidence as determined within the PCR court's discretion.[6]

[41] Judgment reversed and remanded.

Brown, J. and DeBoer, J., concur.

APPELLANT PRO SE

Zachary C. Parksey
Pendleton, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

George P. Sherman
Supervising Deputy Attorney General
Indianapolis, Indiana

---

[6] This remand is only with respect to the issues related to the alleged failure to advise of lifetime parole. To the extent Parksey raised other claims of ineffective assistance of counsel that were rejected below, such were either not raised or not supported by cogent argument on appeal.